OPINION
{¶ 1} Defendant-appellant Jamael Antoine Hancock appeals from his conviction and sentence upon one count of Possession of Crack Cocaine in an amount equaling or exceeding ten grams, but less than twenty-five grams, and one count of Possession of Powder Cocaine in an amount equaling or exceeding five grams, but less than twenty-five grams. Hancock contends that his trial counsel was ineffective for: (1) failing to have interposed an appropriate objection to evidence that a little over $3,500 in cash was recovered from his person at the time of his arrest; and (2) failing to have listed on his witness list the name of a witness who would have contradicted some aspects of the testimony of the arresting police officer. Hancock also contends that his more-than-minimum sentence is contrary to law.
 {¶ 2} We conclude that the record fails to portray ineffective assistance of counsel. The evidence of the cash found on Hancock's person at the time of his arrest supports a reasonable inference that it constituted the proceeds of drug sales, thereby making it relevant and admissible. The record includes a statement by defense counsel that he had determined, in his professional judgment, that the witness whose testimony might have contradicted the testimony of the arresting police officer in some respects was a witness who would make a bad impression on the jury, possibly distracting it from the issues in the case, or even prejudicing it against the defendant. There is nothing in the record to impeach, or otherwise to contradict, this professional judgment of defense counsel.
 {¶ 3} We do conclude, however, that the sentence imposed by the trial court must be reversed upon the authority of State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856. Accordingly, the sentence imposed by the trial court is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for further proceedings.
 I {¶ 4} In late October, 2004, Dayton police officers Michael Wolpert and Matt Beavers became aware of a minivan being driven by Hancock, its only occupant, because of extremely loud music coming from the van. One of the officers recognized Hancock. They knew that Hancock's license had been suspended one or two weeks earlier. They decided to initiate a traffic stop.
 {¶ 5} By the time the officers had turned their cruiser around to follow the van, Hancock had parked the van in a driveway, and was walking away. Beavers got out of the cruiser and began following Hancock on foot, while Wolpert drove the cruiser parallel to Beavers and Hancock, and turned on the cruiser's overhead lights and the passenger side light.
 {¶ 6} As Beavers approached Hancock, Hancock walked away from Beavers and the van, at an angle toward the street. What happened next was described by Wolpert in his testimony as follows:
 {¶ 7} "Q. What happened next?
 {¶ 8} "A. We continued basically at a walking pace. The defendant was walking on the sidewalk, he was walking next to a parked car that was facing north bound. Also it was a blue Pontiac Grandview. This vehicle was parked on the east side curb so it was parked in the street on the east curb. The defendant walked out into the street with his right hand, reached into his pocket, took out two plastic baggies and threw these two plastic baggies under the parked vehicle.
 {¶ 9} * * *
 {¶ 10} "Q. What happened next?
 {¶ 11} "A. We were on Ravenwood, the defendant is watching Officer Beavers over his shoulder not really paying attention to me at all. He starts, as I said he was walking at an angle after he throws the baggie under the car, he runs, my cruiser, walks into my cruiser and Officer Beavers apprehends him."
 {¶ 12} Beavers essentially corroborated Wolpert. With respect to Hancock's having walked into the cruiser, Beavers testified:
 {¶ 13} "Q. Officer Beavers, did you ever witness the defendant hit the cruiser?
 {¶ 14} "A. If it did it was a very light hit. I didn't witness it, a striking of anybody."
 {¶ 15} Wolpert recovered the two plastic baggies. One contained crack cocaine; the other contained cocaine powder. Hancock was arrested.
 {¶ 16} Wolpert was asked on direct examination whether anything was found on Hancock's person at the jail. Hancock objected to this question, upon the ground that there was no showing that Wolpert had the requisite personal knowledge concerning what might have been found upon Hancock's person. This objection was sustained. Whereupon, Wolpert was questioned as follows:
 {¶ 17} "Q. Officer, can you explain this room at the jail that you were talking about where a CO or corrections officer searched the defendant?
 {¶ 18} "A. You go into the jail, the sally port. There are four parking spaces on the right hand side. You walk in, there is a 912 lock to put your gun, your taser and pepper spray and magazine. You walk into a room where it's just the officers and the defendants. You sit there, pass your paperwork through a window, the CO's take it, give your paperwork back and wait in turn for the individual to be called out. You walk through another door so basically it's one room here and then there is a door here and then they go into another room by themselves, the CO and the defendant; therefore, we are no longer in the room. There is a window on that door and a mail slot approximately 12 inches wide and three inches high that you can pass stuff through.
 {¶ 19} "So you can stand at the window and watch if you choose, see the person patted down. That's what the CO does, the patdown. Like I said, it's a more intrusive patdown than we do. Take off their shoes and socks, ask them to lift up their tongue, look under their tongue. They complete their job, count money, they take jewelry, tag it and then they finish and then hand the cuffs back to us through the slide.
 {¶ 20} "Q. And was anything given to you through the mail slot?
 {¶ 21} "A. Three thousand, five hundred, forty-nine dollars."
 {¶ 22} Beavers' testimony on this subject corroborated Wolpert's.
 {¶ 23} Hancock testified in his own defense. He denied having dropped any plastic baggies. He also testified that he was struck by the police cruiser, in a low-impact collision that did not require him to seek medical attention. Finally, he testified that "3500" was recovered from the boots he was wearing, at the jail, after he told the corrections officer about it.
 {¶ 24} Following a jury trial, Hancock was convicted on one count of Possession of Crack Cocaine in an amount equaling at least ten grams, but less than twenty-five grams, and on one count of Possession of Powder Cocaine in an amount equaling at least five grams, but less than twenty-five grams. He was sentenced to four years imprisonment on the first count, and twelve months imprisonment on the second count, to be served concurrently, for an aggregate sentence of four years, and his driver's license was suspended for six months.
 {¶ 25} From his conviction and sentence, Hancock appeals.
 II {¶ 26} Hancock's First Assignment of Error is as follows:
 {¶ 27} "AS A MATTER OF LAW, THE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL FAILED TO OBJECT TO TESTIMONY REGARDING MONEY FOUND ON THE DEFENDANT DURING HIS ARREST AS WELL AS FAILING TO CALL WITNESSES WHICH WOULD HAVE REFUTED TESTIMONY OFFERED BY THE STATE, AND THEREBY SAID REPRESENTATION VIOLATED DEFENDANT[']S CONSTITUTIONAL RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION."
 {¶ 28} Although Hancock cites the Due Process clause, we understand him to be invoking his right to the assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
 A {¶ 29} Hancock first argues that his counsel was ineffective for having failed to object to testimony about the $3,549 in cash recovered from his person at the jail, upon the ground that it was not relevant, or, at least that its probative value was outweighed by its undue prejudicial impact on the jury. We conclude that there was no basis for an objection.
 {¶ 30} Common sense would inform a juror that someone selling drugs is likely to require cash. Checks, credit cards, bills of credit, or other media of payment are apt to prove problematic, given the illegality of the underlying transaction and the general untrustworthiness of the persons engaging in those illegal transactions. A juror could reasonably infer, then, that the substantial amount of cash found on Hancock's person represented proceeds from drug sales.
 {¶ 31} Hancock protests that there could be innocent explanations for the $3,549 in cash found on his person, and that he should not be forced to rebut an inference of guilt when there are innocent inferences that could be drawn from the same facts. This is similar to the principle set forth in State v. Kulig
(1974), 37 Ohio St.2d 157, 66 O.O.2d 352, 309 N.E.2d 897, that circumstantial evidence inferring guilt is insufficient to sustain a conviction if there is a theory of innocence that can reasonably be inferred from the same predicate facts. This principle was overruled in State v. Jenks (1991),61 Ohio St.3d 259, 272, in which the Ohio Supreme Court held that circumstantial evidence need not be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We conclude, therefore, that evidence supporting a reasonable inference of guilt is probative of guilt, and consequently admissible, even though there are competing, reasonable inferences of innocence arising from the same evidence.
 {¶ 32} Hancock was free to argue competing, reasonable inferences of innocence to the jury. The prejudicial impact that Hancock complains of — that a jury might infer, from the fact that he was carrying $3,549 in cash on his person, that he was currently involved in illegal activity — is, of course, precisely the reasonable inference of guilt that the jury is permitted to draw from this evidence. In other words, its prejudicial impact upon Hancock is precisely the probative evidence of guilt that it represents. All evidence probative of guilt is necessarily prejudicial. It is only undue prejudice that can outweigh the probative value of the evidence, and require its exclusion pursuant to Evid. R. 403(A). An example would be evidence that the officers had arrested Hancock for some other offense a month earlier. While this might have some relevance by showing why the officers took an interest in Hancock on this later occasion, it would be outweighed by its undue prejudice. The fact that Hancock had been arrested by the officers on some prior occasion would not be probative of the factual proposition that he was engaged in criminal activity on this occasion.
 {¶ 33} Because we conclude that the objection to this evidence that Hancock contends his trial counsel should have interposed is not a valid objection, it follows that we conclude that his trial counsel was not ineffective for having failed to interpose it.
 B {¶ 34} Hancock next contends that his trial counsel was ineffective for having failed to list a witness, "Mark," on his pre-trial witness list, thereby precluding him from being able to call "Mark" as a witness to contradict the testimony of the arresting police officers, Wolpert and Beavers, in some respects. This issue arose when Hancock's trial counsel attempted to elicit from Beavers that a bystander had called out "Why did you hit him with the car," thereby impeaching the officers' testimony that Hancock walked into the cruiser, rather than the other way around. That part of the transcript is worth recounting in detail:
 {¶ 35} "Q. Isn't it true that people — people standing there said, `What are ya'll doing to him? Why did you hit him with the car?'
 {¶ 36} "MS. FELLER [representing the State]: Objection. Your Honor, that's hearsay as to what anybody might have said. There has been no testimony about that at this point. He said nobody was around. And Mr. Vannoy is trying to get him to say something about other people, what they might have said.
 {¶ 37} "(Sidebar.)
 {¶ 38} "MR. VANNOY [representing Hancock]: Two responses, your Honor. The officer just testified that there was no one else around initially. When I challenged him on that issue, he said, well, nobody of consequence. I don't know what the last part of his statement was but note the objection. I could not quite hear exactly what he was saying.
 {¶ 39} "Your Honor, we believe that there were people out there and I have the option to ask this witness whether or not he said there was nobody out there. There were people out there on the scene, there were people there. And I think my rebuttal witness may be recalled because people challenged him and this officer has instructed the people to stay out of it and step back.
 {¶ 40} "MS. FELLER: Asking them if there were people at the scene is different than asking him what those people said.
 {¶ 41} "MR. VANNOY: With respect to the hearsay allegation, people making a statement, `why did you hit him with the car,' that's excited utterance, one thing. Maybe a present sense impression, as well, that they perceive that this car hit this man.
 {¶ 42} "THE COURT: Keep your voice down.
 {¶ 43} "MR. VANNOY: I'm sorry. It's a present sense impression, `why did you just hit him with the car'? That's not hearsay. That's not hearsay. That's a present sense impression. They're perceiving the event and they make a statement while the event is occurring.
 {¶ 44} "MS FELLER: Your Honor, I don't believe so because he testified nobody else was around. What his testimony was, Mr. Vannoy says he testified that if there were other people around, he didn't see them. And trying to get in hearsay, clearly he would be trying to get that in for the proof of the matter, not for any other purpose.
 {¶ 45} "MR. VANNOY: I don't care about whether or not it's true that he hit him with a car. My client walked into the car. That is not the issue. The issue is there were people out there and I can rephrase the question. I can ask him again but I was not clear about what he said, this piece about, well, not of consequence or I didn't quite get what he said there, Judge. I did not hear the answer.
 {¶ 46} "THE COURT: First of all, do you have a good faith basis to ask this question?
 {¶ 47} "MR. VANNOY: I do.
 {¶ 48} "THE COURT: So you do have a witness that would testify that he said, `why did you hit him with the car,' whatever. Would he be able to testify in the event the officer says no?
 {¶ 49} "MR. VANNOY: There is a young man across the street. I didn't subpoena him because I did not think he was going to be a good witness. His name is Mark. He lives right across the street from 2040 Ravenwood. I didn't subpoena him.
 {¶ 50} "And I didn't think he was a good person to bring in but he saw all of this going on. He's not the kind of guy that I want to present to this jury but I do have a good faith basis for raising this issue that individuals indicated to me. I went out to the scene. This guy has got dogs. He just does not seem like a witness I want to subpoena; but if I have to bring him in as rebuttal to what the police officer said about being out, there were people out there, I mean, it's night time on Ravenwood. Talked about it being a high crime area. There are plenty of people on that street all the time.
 {¶ 51} "MS. FELLER: Your Honor, all due respect to Mr. Vannoy, that was not provided in discovery and he did not have a witness list or anything like that.
 {¶ 52} "MR. VANNOY: Because I didn't believe that he would be a good witness for me to call.
 {¶ 53} "MS. FELLER: Regardless if you thought that he was a good witness. You should have put him on the witness list whether you knew even if he was good or not good. He would have been able to provide witnesses.
 {¶ 54} "THE COURT: So you had decided not call [sic] this person because you didn't think he would be a good witness.
 {¶ 55} "MR. VANNOY: Yes, your Honor.
 {¶ 56} "THE COURT: Now, you're asking this officer about the witness, this person's made this statement about the cruiser hitting the defendant. Testimony based upon a witness that you didn't think is credible that you're now intending to call?
 {¶ 57} "MR. VANNOY: Judge, it would never have come out. I believe it's a lie that no one else is out in the street. He didn't have to say that, Judge. He just said that — just added that for value. There are plenty of people on the street. I can withdraw my statement but I would like to ask him again whether or not there was anybody out on the street.
 {¶ 58} "THE COURT: You want to withdraw that question?
 {¶ 59} "MR. VANNOY: I'll withdraw that question.
 {¶ 60} "THE COURT: What's the next question?
 {¶ 61} "MR. VANNOY: Officer, is your testimony there were no other individuals out on the street.?
 {¶ 62} * * *
 {¶ 63} "MS. FELLER: I think the previous question should be stricken because the evidence that he's now going — I said that I think the previous question should be stricken because it's, because the evidence that, there were assumed facts not in evidence and the question is going to be withdrawn. I don't think the jury should be able to consider the question at all.
 {¶ 64} "THE COURT: Well, I agree the question is withdrawn, the jury should disregard the question. I agree with that.
 {¶ 65} "MR. VANNOY: Okay, withdraw the question.
 {¶ 66} "(Sidebar concluded.)
 {¶ 67} "MR. VANNOY: Your Honor, for the record, I will withdraw that question and rephrase it.
 {¶ 68} "THE COURT: Therefore, the jury is instructed to disregard the last question since it's been withdrawn by Mr. Vannoy and on to your next question."
 {¶ 69} Whereupon, Hancock's trial counsel attempted, unsuccessfully, to get Wolpert to admit that there were other persons present in the nearby vicinity. Trial counsel then dropped this subject and moved on to another.
 {¶ 70} From this context, it is apparent to us that Hancock's trial counsel had formed a professional judgment that "Mark," the individual who was the source of his information that someone had called out to the Wolpert, "why did you hit him with the car," was a bad witness, who would make a bad impression on the jury, which would at least distract from Hancock's case, if not actually prejudice the jury against Hancock. It appears that trial counsel never intended to call "Mark" as a witness, but cited the information obtained from "Mark" as his basis for the question to Wolpert, when challenged by the trial court whether he had a basis, in good faith, for the question.
 {¶ 71} As Hancock notes in his brief, an attorney admitted to practice in Ohio is presumed competent. State v. Bradley
(1989), 42 Ohio St.3d 136. We note that Anthony VanNoy, Hancock's trial counsel, is an experienced criminal defense lawyer. The record includes his representation, presumably based upon his professional judgment, that "Mark" was a bad witness who would make a bad impression on the jury. There is nothing in the record to contradict or to impeach this professional judgment. Accordingly, we conclude that the record fails to portray that Hancock's trial counsel's representation fell below an objective standard of reasonableness.
 {¶ 72} Hancock's First Assignment of Error is overruled.
 III {¶ 73} Hancock's Second Assignment of Error is as follows:
 {¶ 74} "WHETHER THE DEFENDANT'S SENTENCE, WHICH EXCEEDED THE MINIMUM PRISON SENTENCE FOR THE OFFENSE, WAS IN VIOLATION OF R.C. §§ 2929.11 THROUGH 2929.14 AND THUS WAS DEFICIENT ACCORDING TO LAW."
 {¶ 75} Both parties recognize the application of State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, to the issue of a more-than-minimum felony sentence. The State argues that Hancock waived any remedy under State v. Foster, supra, by not having raised the issue in the trial court, but recognizes that we are not likely to agree, in view of our decisions in a line of recent cases including State v. Mitchell, 2006-Ohio-1259, Clark App. No. 2005 CA 58, and State v. Miller, 2006-Ohio-1138, Montgomery App. No. 21054. We see no reason to depart from this line of cases. We continue to regard ¶ 104 of State v. Foster, supra, as mandating the reversal of a felony sentence in a case pending on appeal at the time Foster was decided, in which the sentence, itself was appealed, involving the application of a part of the statute declared unconstitutional, and severed, pursuant to Foster.
 {¶ 76} Hancock, while generally agreeing with this approach, seems to be asking us to declare that State v. Foster, supra, leaves intact the requirement, in R.C. 2929.11, that a trial court, in imposing a felony sentence, must consider the purposes and principles of sentencing set forth in the statute. We do not understand the State to be in disagreement with this proposition. The application of the requirement set forth in R.C. 2929.11 is addressed in ¶¶ 36-42 of State v. Foster, supra, and there is no indication therein that this requirement no longer applies.
 {¶ 77} In any event, Hancock's Second Assignment of Error is sustained to the extent that State v. Foster, supra, requires that the sentence imposed by the trial court be reversed, and this cause be remanded for re-sentencing in accordance withFoster.
 IV {¶ 78} Hancock's First Assignment of Error having been overruled, and his Second Assignment of Error having been sustained, in part, the sentence imposed by the trial court is Reversed, and this cause is Remanded for re-sentencing in accordance with State v. Foster, supra.
Grady, P.J., and Brogan, J. concur.